UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARY THOMAS,

            Plaintiffs,

    v.

TOM VILSACK, Secretary,
Department of Agriculture,

          Defendants.

Civil Action No. 08-0042 (AK)

## <u>MEMORANDUM OPINION</u>[1]

Pending before this Court is Defendant's Motion for Summary Judgment ("Mot. for Summ. J.")[2] [42], Plaintiff's Opposition and Memorandum of Points and Authorities to Defendant's Motion ("Opp'n to Mot. for Summ. J.") [47], and Defendant's Reply to the Opposition ("Reply to Mot. for Summ. J.") [53]. The Court held a hearing on Defendant's Motion on April 9, 2010. For the reasons set forth herein, Defendant's Motion is granted in part and denied in part. An appropriate Order accompanies this Memorandum Opinion.

## I.  BACKGROUND

On January 8, 2008, the Plaintiff, Mary Thomas, sued her employer, the Department of

---

[1]On April 28, 2008, this case was assigned to the undersigned Magistrate Judge for all purposes, including trial, with the consent of all parties. *See* Consent to Proceed Before a United States Magistrate for All Purposes [8].

[2] With the consent of the parties, Defendant's Motion for Partial Summary Judgment ("Mot. for Partial Summ. J.") [22], Plaintiff's Opposition ("Opp'n to Mot. for Partial Summ. J.") [27], and Defendant's Reply ("Reply to Mot. for Partial Summ. J.") [31] have been combined with and incorporated into the above motion for the Court's consideration. This Court had previously deferred ruling on the Motion for Partial Summary Judgment until after the close of discovery. *See* Minute Order dated 08/24/09.

Agriculture ("USDA" or "the agency") for violating Title VII on the basis of race, sex, and retaliation. (*See* Compl. [1].) Plaintiff alleges that Defendant discriminated against her when it (1) paid her at a lower rate than white males holding the same position; (2) removed her as the Chief Information Officer ("CIO"); (3) reassigned her to a lateral position with almost no responsibilities; and (4) rejected her application for promotion to the CIO position when it was upgraded to the Senior Executive Service ("SES") level. In its motions for summary judgment and partial summary judgment, Defendant asserts that Plaintiff failed to exhaust her administrative remedy as to her second claim, and that it is entitled to summary judgment as a matter of law on all other claims.

### A.     Failure to Promote to SES

Plaintiff, an African-American female, has been an employee with the Department of Agriculture since 1978. From 1999 to 2005, she served as the CIO and Director of the Information Technology Division ("ITD") of the National Resources Conservation Service ("NRCS") at the GS-15 level. (2005 ROI [42-2] at 74.) In that position, she supervised over 250 employees located in two different offices. (2005 ROI at 74.) At the time of the alleged adverse actions in this case, Bruce Knight was the Chief of NRCS. (Knight Dep. 11/24/08 [53-4] at 7.) In 2004, Dana York was appointed as Mr. Knight's Associate Chief. Both individuals are white. (2005 ROI at 74.) Plaintiff's direct supervisor, Dwight Holman, served as Deputy Chief for Management and reported directly to the Associate Chief, Ms. York. (2005 ROI at 74.) Mr. Holman is African American. (2005 ROI at 74.)

Since 2000, Plaintiff had regularly and unsuccessfully sought an SES position. (Pl. Ex. 3 [47-3].) After Plaintiff was appointed as Acting CIO and Director of ITD in 1999, it came to her

attention that white males serving as CIO's within the USDA were paid at the SES level. (*See* Pl. Ex. 3 at 1; Thomas Dep. 3/16/09 at 101.) According to Plaintiff, she inquired several times to Mr. Holman about having her position upgraded to the SES level. (2005 ROI at 78.) While Mr. Holman indicated he would pursue that on her behalf, nothing ever came of it. (2005 ROI at 78-79.)

In July 2004, Plaintiff revisited the issue and asked Mr. Holman to reclassify her position to an SES like her white male counterparts. (Pl. Ex. 3 at 1.) Mr. Holman agreed and set about to complete the reclassification process with Plaintiff's assistance and input. (2005 ROI at 91.) In August 2004, Mr. Holman certified that the duties and responsibilities of the CIO and Director of ITD should be separated and that the CIO duties "merited the SES designation." (E-Exs. at E-777.) This certification was then forwarded to Mr. Knight, who was responsible for finalizing the reclassification and making the request for an SES slot. (2005 ROI at 91.) However, Mr. Knight did not pursue the matter in 2004, and the CIO position remained officially classified as a GS-15 until August 2005. (2005 ROI at 91.) On August 5, 2004, Mr. Holman advised Plaintiff that his superiors would not move forward with reclassifying the position. (Pl. Ex. 3 at 2.) At that time, neither Mr. Knight nor Ms. York indicated that there were any issues with Plaintiff's performance to Mr. Holman or to Plaintiff. (2005 ROI at 91.)

## B.    First EEO Complaint

On August 2, 2004, Plaintiff contacted one of the agency's EEO counselors, alleging that she was discriminated against "based on her race, age, sex, and reprisal," when she was repeatedly not promoted to the SES level like others who were similarly situated. (*See* Pl. Ex. 48 at 3, 5.) Because the agency did not take any action after she contacted the EEO counselor,

Plaintiff filed a formal EEO complaint with the agency on November 5, 2004.  (Pl. Ex. 48 at 3.)

On May 19, 2005, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") of

the Equal Employment Opportunity Commission ("EEOC") because the agency had taken no

steps to investigate her complaint.  (Pl. Ex. 3 at 2.)  That same day, an ALJ at the EEOC ordered

the USDA to submit the complaint file and its report of investigation.  (*Id.*)  On June 22, 2005,

the agency responded to the ALJ's order by requesting a 60-day extension to complete the

investigation.  (Pl. Ex. 3 at 2.)  However, the agency never completed an investigation.

### C.    NRCS Performance Issues

Mr. Holman testified that during the year that Plaintiff was pursuing her first EEO

complaint, she continued to perform at a high level and that he did not receive any complaints

about her performance from his superiors.  (*See* 2005 ROI at 91; *see also* Holman Dep. 3/4/09 at

32-33, 94-95.)  However, Ms. York testified that she started receiving complaints about Plaintiff

as early as 2004 and states that she passed these complaints on to Mr. Holman.  (Pl. Ex. 27.)

Although Mr. Holman states that he did not receive any complaints about Plaintiff, Ms. York

approached Mr. Holman in March 2005 to complain about a wide array of problems she

perceived existed in *his* management area, including his management of the ITD.  (Holman Dep.

3/4/09 at 33-34; Pl. Ex. 8.)  Mr. Holman responded in great detail to each of Ms. York

complaints. (Pl. Ex. 9.)  Mr. Holman's bottom-line response was that despite his repeated

requests to his superiors, he was not given the funding and support that would enable him to

resolve the issues Ms. York raised.  (Pl. Ex. 35 at 33-35, 94-95; Pl. Ex. 9.)

In late July 2005, Mr. Holman was called into a meeting by Mr. Knight and Ms. York.

(2005 ROI at 91.)  At this meeting, he was ordered to remove the duties of the CIO from

Plaintiff.  (*Id.*)  Mr. Holman was told that David Combs, the USDA's CIO, had reported that

Plaintiff had missed several agency-wide CIO meetings and that NRCS was being graded poorly

on IT security issues based on the President's Management Agenda ("PMA").  (2005 ROI at 24,

91; Pl. Ex. 33 at 33, 36.)  Mr. Holman stated that he disagreed with the decision and that many of

the complaints about Plaintiff were not within her control.  (2005 ROI at 91; Holman Dep. 3/4/09

at 33-34.)  Later, security issues with a program called ProTracts were cited as one of the other

reasons for removing Plaintiff's CIO duties.  (*See, e.g.*, Pl. Ex. 24; Pl. Ex. 33 at 32-34; Pl. Ex. 32

at 16-18, 22-23.)  However, ProTracts was run by Jack Carlson, Director of the Information

Technology Center at Ft. Collins, Colorado – an office under the supervision of the ITD and

subordinate to Plaintiff.  (Pl. Ex. 54; Pl. Ex. 35 at 36, 52-56; Thomas Depo. 3/16/09 at 15-16.)

Mr. Carlson never received any repercussions or discipline for the problems with ProTracts.  (Pl.

Ex. 35 at 55-56, 133.)

Mr. Knight and Ms. York also complained of the PMA scorecard ratings that IT received

during Plaintiff's tenure and of IT problems raised in the 2002 and 2004 Office of Inspector

General (OIG) audits. (Pl. Ex. 33 at 33-37.)  Evidence indicates, however, that Plaintiff was

excluded from important IT matters that should have been reported to her as the CIO and

Director of ITD.  (*See* Thomas Dep. 3/16/09 at 25-26, 33-34; Pl. Exs. 22 & 23; Pl. Ex. 32 at 34-

35.)  Additionally, several PMA scorecard ratings from that time period show ITD scoring out as

green or yellow, not red as indicated by Mr. Knight and Ms. York.  (*See* Pl. Exs. 16 & 17.)

According to Mr. Holman, these complaints from Mr. Knight and Ms. York were the first

he received about Plaintiff's performance.  (Holman Dep. 3/4/09 at 32-33.)  Mr. Holman testified

that he tried to dissuade Mr. Knight and Ms. York from removing Plaintiff's CIO duties and to

allow her the opportunity to improve, but to no avail. (2005 ROI at 91.) Conversely, Mr. Knight

testified that he had received "numerous complaints" about Plaintiff from Mr. Combs regarding

"missed deadlines, lack of performance, [and] lack of attendance at his management meetings."

(Knight Dep. 11/24/08 at 23.) In response to interrogatories, Ms. York also said that she had

received several complaints about Plaintiff's performance. (Pl. Ex. 27.) According to Mr.

Combs, however, he had never made any complaints about Plaintiff's performance prior to a

lunch meeting he had with Mr. Knight shortly before August 2005. (Pl. Ex. 31 at 52; Pl. Ex. 25.)

Mr. Combs testified that at the meeting Mr. Knight asked him about his thoughts on Plaintiff.

(Pl. Ex. 25; Pl. Ex. 31 at 53-54.) According to Mr. Combs, he simply relayed to Mr. Knight his

concerns about performance in some of NRCS's IT areas and the fact that he had little contact

with Plaintiff because she was either not present or did not participate actively at the agency-wide

CIO meetings. (Pl. Ex. 25; Pl. Ex. 31 at 53-54.) Mr. Combs testified that he only discussed his

thoughts on Plaintiff and the ITD's performance because Mr. Knight asked him directly about it.

(Pl. Ex. 31 at 53-54.) Mr. Combs testified that he never had any other discussion with Mr.

Knight about Plaintiff's performance nor did he ever initiate one. (Pl. Ex. 25; Pl. Ex. 31 at 52.)

### D. Plaintiff's Removal as CIO

Pursuant to Mr. Knight's and Ms. York's orders, on August 2, 2005, Mr. Holman notified

Plaintiff that he would be removing her CIO duties. (Pl. Ex. 3 at 2.) He also gave her a

memorandum dated August 4, 2005, that said her CIO duties would be removed effective August

6, 2005. (2005 ROI at 23.) Mr. Holman communicated to Plaintiff that she was being removed

because of meetings she had missed and other alleged deficiencies in her performance. (Pl. Ex. 3

at 2.) This was the first time Plaintiff had received any complaints about her performance. (Pl.

Ex. 53.) Although she was to retain the Director of ITD position, Plaintiff testified that she feared further reprisal and thus requested a transfer. (Pl. Ex. 52; 2005 ROI at 24A.) In the interim, Mr. Holman directed her to work from home until her new assignment came through. (Pl. Ex. 3 at 2.) On October 2, 2005, Plaintiff was officially reassigned to a Program Analyst position under the supervision of David Gagner. (2005 ROI at 17.) Plaintiff contacted the agency's EEO office on October 15, 2005, to lodge a complaint regarding the removal of her CIO duties and her reassignment to the Program Analyst position. (2005 ROI at 2; *see generally* 2006 ROI..)

### E. CIO Reclassification as SES

Simultaneously with removing Plaintiff's CIO duties in August 2005, the agency reclassified the CIO position as an SES – twelve months after Mr. Holman had made the SES certification request to Mr. Knight. (Pl. Ex. 35 at 30-32, 38-41.) While attempting to process the SES certification, Ms. York had the date on Mr. Holman's original request changed from 2004 to the then current date in 2005. (Pl. Ex. 4; Pl. Ex. 34 at 8-9.) After the SES certification was approved by USDA officials and the SES slot was given to NRCS, a vacancy announcement for the CIO position was issued. (Pl. Ex. 35 at 109-11.) Mr. Carlson had been appointed Acting CIO following Plaintiff's removal. (*Id.* at 41.) Both he and Plaintiff applied for the position. (*Id.* at 41-42.) Mr. Holman recommended Plaintiff to Mr. Knight, but Mr. Knight chose Mr. Carlson, who is a white male. (*Id.* at 41-42.) No interviews were held. (Pl. Ex. 38 at 24.) Mr. Knight indicated to Mr. Holman that he rejected Plaintiff for the same reasons he had her CIO duties removed in the first place. (Pl. Ex. 35 at 42-44.) Plaintiff filed a third EEO complaint on April 4, 2006, regarding her non-selection to the CIO position. (2006 ROI at 2.)

### F.      Program Analyst Duties

From October 2005 to October 2006, Plaintiff served in the Program Analyst position. (Pl. Ex. 3 at 3.)  The position carried duties and responsibilities drastically reduced from those Plaintiff had exercised as CIO and Director of ITD.  (*Id.*)  The position had no supervisory responsibilities and involved very little substantive work.  (2005 ROI at 16.)  In the year that Plaintiff held the position, she received only two assignments, which required only eight days of work.  (Pl. Ex. 3 at 3.)  After achieving no success with her EEO complaints, Plaintiff filed a complaint in the instant action on January 8, 2008.

## II.     STANDARD OF REVIEW FOR SUMMARY JUDGMENT

A court should grant summary judgment if the pleadings, depositions, answers to interrogatories, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Although a court should draw all reasonable inferences from the records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is insufficient to bar summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The adverse party's pleading must demonstrate the existence of a genuine issue of material fact.  *Id.*  To be genuine, the issue must be supported by sufficiently admissible evidence such that a reasonable trier of fact could find for the nonmoving party.  *Id.* In determining materiality, the factual assertion must be capable of affecting the substantive outcome of the litigation.  *Id.*; *see Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).

Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment .  *Anderson*, 477 U.S. 247-48.  The nonmoving

party bears the affirmative duty to present, by affidavits or other means, specific facts showing that there is a genuine issue for trial. *Id.* at 248-49. The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in the context of discrimination cases, summary judgment should be approached with caution because of the difficulty of proving discriminatory intent and disparate treatment, but "a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Morgan v. Federal Home Loan Mortgage Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001) (citation omitted).

## III.    LEGAL STANDARDS FOR TITLE VII CLAIMS

### A.    Discrimination and Retaliation Claims

Title VII requires that "[a]ll personnel actions affecting employees . . . in executive agencies . . . shall be made free from any discrimination based on race." 42 U.S.C. § 2000e-16(a). Where, as here, there is no direct evidence of discrimination, the Court assesses a plaintiff's racial discrimination and retaliation claims under the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). Under this framework, the plaintiff bears the initial burden of proving a *prima facie* case of discrimination by a preponderance of the evidence. *Id.*

The requirements for a *prima facie* case of discrimination are flexible and vary depending on the type of case. *McDonnell Douglas*, 411 U.S. at 804 n.13. To establish a claim of discrimination, the plaintiff must prove that (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; and (3) the adverse action gives rise to an inference

of discrimination.  *Stella v. Mineta*, 284 F. 3d 135, 145 (D.C. Cir. 2002) (citation omitted).

Under Title VII, an adverse action in the discrimination context has occurred "when an employee experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm."  *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006). To rise to this level of actionable harm, there must be a "tangible change in the duties or working conditions constituting a material employment disadvantage," *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002), such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits,"*Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir.2009) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).  "[P]urely subjective injuries" will not suffice.  *Holcomb*, 433 F.3d at 902.

To prove a *prima facie* retaliation claim, the plaintiff must show that (1) she engaged in statutorily protected activity; (2) the employer subjected her to an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action. *McDonnel Douglas*, 411 U.S. at 802; *Pardo-Kronemann v. Jackson*, 541 F. Supp. 2d 210, 214 (D.D.C. 2008), *aff'd in part, rev'd in part*, 601 F.3d 599 (D.C. Cir. 2010).  In the retaliation context, a more generous standard is applied to allegations that an employee was subject to an adverse employment action.  *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 n.4 (D.C. Cir. 2008) (citing *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 66-67 (2006)).  In a retaliation claim, a "materially adverse employment action" is an action that "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Burlington N.*, 548 U.S. at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006).

In proving causation for a retaliation claim, the courts may focus on temporal proximity absent other evidence. *Pearsall v. Holder*, 610 F. Supp. 2d 87, 97 n.7 (D.D.C. 2009). While this Court has sometimes held that the retaliation must occur soon after the employee's protected activity, *see, e.g.*, *Baker v. Potter*, 294 F. Supp. 2d 33, 41 (D.D.C. 2003) (holding two months could be too long in many circumstances), "there is no hard-and-fast rule that any specified amount of time is too removed for an inference of causation," *Pardo-Kronemann*, 541 F. Supp. 2d at 218. For instance, where "a defendant retaliates at the first opportunity that is presented, a plaintiff will not be foreclosed from making out a *prima facie* case despite a substantial gap in time." *Id.*

Once the plaintiff establishes a *prima facie* case of discrimination or retaliation, the burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the action. 541 F. Supp. 2d at 214. The defendant's burden is one of production, not of proof. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). The employer "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.* at 254. Therefore, defendant's burden is satisfied if it simply explains what it has done or produces evidence of legitimate, nondiscriminatory reasons. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).

The D.C. Circuit has recently held that, on a motion for summary judgment, once a defendant asserts a legitimate non-discriminatory reason for the adverse action, the *McDonnell Douglas* burden-shifting framework essentially evaporates, and the sole remaining issue is discrimination or retaliation *vel non*. *Pardo-Kronemann v. Jackson*, 601 F.3d 599, 603 (D.C.

Cir. 2010); *see Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Thus, a prolonged inquiry into the sufficiency of the plaintiff's *prima facie* case becomes unnecessary, and the only inquiry remaining is whether "the [plaintiff] produced sufficient evidence for a reasonable jury to find that the [defendant's] asserted non-discriminatory reason was not the actual reason and that the [defendant] intentionally discriminated against the [plaintiff] on [a prohibited basis]." *Brady*, 520 F.3d at 494. The ultimate burden of persuasion always remains with the plaintiff to prove that he or she was subjected to discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

A number of factors will be considered, including "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Reeves*, 530 U.S. at 148-49; *accord Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc). If the plaintiff can show that a reasonable jury could conclude from all the evidence that the adverse employment action was made for a discriminatory reason, then the motion for summary judgment should be denied. *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003).

### B.     Exhaustion of Administrative Remedies

A federal government employee who believes that she has been subject to unlawful discrimination or retaliation must "initiate contact" with an EEO Counselor in her agency "within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1); *see* 42 U.S.C. § 2000e-16; *see also Weber v. Battista*, 494 F.3d 179, 182-83 (D.C. Cir. 2007). Exhaustion of this administrative remedy is a prerequisite to judicial relief. *Siegel v. Kreps*, 654

F. 2d 773, 776-77 (D.C. Cir. 1981). "Because timely exhaustion of administrative remedies is a prerequisite to a Title VII action against the federal government," a court may not consider a discrimination claim that has not been exhausted in this manner absent a basis for equitable tolling. *Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003); *see Greer v. Paulson*, 505 F.3d 1306, 1316-17 (D.C. Cir. 2007).

A plaintiff is required to initiate EEO contact for each discrete adverse employment action. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002). "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges . . . [E]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* at 113. However, a continuing violation is treated differently. "For statute of limitations purposes, a continuing violation is 'one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period.'" *Hines v. Bair*, 594 F. Supp. 2d 17, 24 (D.D.C. 2009) (quoting *Taylor v. FDIC*, 132 F.3d 753, 765 (D.C. Cir. 1997)). A plaintiff may not benefit from the continuing violation period if the event in action is a "discrete act" within the meaning of *Morgan*. *Id.* at 25.

Failure to comply with these requirements does not erect a jurisdictional bar to suit, but operates as a statute of limitations defense. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982). It is an affirmative defense, which the defendant must plead and prove. *Nat'l R.R. Passenger Corp.*, 536 U.S. at 121-22; *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997). "If the defendant meets its burden, the plaintiff then bears the burden of pleading and proving facts supporting equitable avoidance of the defense." *Bowden*, 106 F.3d at 437 (citations

-13-

omitted).  This time limit is thus subject to waiver, estoppel, and equitable tolling, but these

equitable doctrines must be applied sparingly.  *Morgan*, 536 U.S. at 103; *Bowden*, 106 F. 3d at

437.

## IV.    ANALYSIS

### A.    2004 EEO Complaint

On August 2, 2004, Plaintiff initiated EEO contact to complain that she was

discriminated against on the basis of race, sex, and reprisal when she was repeatedly not

promoted to an SES position since 1999.  (2004 ROI at 1-5.)  Plaintiff has since conceded that

except for the period of June 18, 2004, to August 2, 2004 – the 45-day time period before she

made EEO contact – she has not exhausted her administrative remedies for any claims from 1999

to June 18, 2004.  (Opp'n to Mot. for Partial Summ. J. at 12; Hr'g Tr. 4/9/10 at 67-70.)

However, during the period of June 18 to August 2, 2004, Plaintiff alleges that she was

the victim of pay discrimination because she only made a GS-15 salary while white males

serving as CIOs within her agency were receiving SES salaries.  (Opp'n to Mot. for Partial

Summ. J. at 12.)  Under Title VII, it shall "be an unlawful employment practice for an employer .

. . to discriminate against any individual with respect to compensation . . . because of such

individual's race . . . [or] sex."  42 U.S.C. 2000e-2(a)(1).  As her comparator, Plaintiff looks to

Jack Carlson, her subordinate and the Director of the Information Technology Center in

Colorado.  (Opp'n to Mot. for Summ. J. at 39-40.)  Plaintiff alleges that when Mr. Carlson was

appointed to the CIO position in 2006, his salary was $150,670 per year.  (*Id.* at 39.)  In contrast,

Plaintiff earned $130,305 as the CIO in 2004.  (*Id.* at 40.)  Converting Plaintiff's salary to the

2006 equivalent, Plaintiff's pay still would have only been $139,774, thus proving, Plaintiff

-14-

argues, a *prima facie* case of pay discrimination in violation of Title VII.  (*Id.*)

This Circuit has not explicitly held whether or not a plaintiff can use a successor as a comparator for a pay discrimination claim.[3]  Assuming that it is proper to use a successor as a comparator, Plaintiff establishes a prima facie case for pay discrimination because she is a black female who was paid at a lower rate than Mr. Carlson, a white male, while performing under the same job description.  Defendant asserts, however, that the disparity arises from a legitimate, non-discriminatory reason – namely, that the job classification changed prior to Mr. Carlson's selection as CIO.  (Reply to Mot. for Summ. J. at 4.)  When Plaintiff held the position, it was classified at the GS-15 level.  (*Id.* at 3.)  According to Defendant, the position had always been classified at the GS-15 level, and it had not been upgraded to the SES level as of 2004 because there were no SES slots available at that time.  (*Id.*)  In 2005, the position was reclassified to the SES level.  (*Id.* at 4.)  When Mr. Carlson was selected for the position in 2006, he was therefore paid at the SES level.  (*Id.* at 4-5; Fleming Decl. dated 3/25/10 at 3-4.)  Thus, the pay disparity was based on the differences between the GS and SES pay scales.  (Reply to Mot. for Summ. J. at 4-5; Fleming Decl. dated 3/25/10 at 3-4.)

Plaintiff offers no evidence that the disparity was based on race or sex.  In fact, when Mr. Carlson was Acting CIO in 2005 – before the position was reclassified to the SES level and he was selected as the new CIO – he and Plaintiff were making the same base salary, and the only difference in pay was based on the locality adjustments mandated by the GS pay scale.  (Reply to

---

[3]  *But see Broadus v. O.K. Indus., Inc.*, 226 F.3d 937, 942 (8th Cir. 2000) (permitting use of non-immediate successor as comparator for Equal Pay Act claim because he performed substantially equal work to the plaintiff); *Patkus v. Sangamon-Cass Consortium*, 769 F.2d 1251, 1260 (7th Cir. 1985) (holding that where successor employee of different gender is paid more, plaintiff established a prima facie case under the Equal Pay Act).

Mot. for Summ. J. at 4-5.)  Had Plaintiff been selected to the CIO position after it was

reclassified, she would have made the same exact salary as Mr. Carlson made in that position.

(Reply to Mot. for Summ. J. at 5; Fleming Decl. dated 3/25/10 at 4.)

Title VII provides that any differential authorized by the Equal Pay Act shall not

constitute a violation of Title VII.  *See* 42 U.S.C. 2000e-2(h); *see also Washington County v.*

*Gunther*, 425 U.S. 161, 167 (1981).  The four statutory exceptions in the Equal Pay Act are: (1) a

seniority system; (2) a merit system; (3) a system that ties earnings to quality or quantity of

production; and (4) any other factor other than sex.  29 U.S.C. 206(d)(1).  The Supreme Court

has held that a "bona-fide job classification system" is a factor that falls under the fourth

exception, as long as the system is applied in a gender neutral manner.  *Corning Glass Works v.*

*Brennan*, 417 U.S. 1888, 201 (1974).  In this case, the GS and SES systems are bonafide

classification systems, and Plaintiff presents no evidence that these systems were not set or

applied in a gender neutral manner.

Furthermore, to the extent that Plaintiff claims the position was misclassified when she

held it, the proper avenue for redress would be to appeal the classification of her duties to the

Office of Personnel Management.  *Shamey v. Administrator, Gen. Servs. Admin.*, 732 F. Supp.

122, 135 (D.D.C. 1990).  Regardless, a classification evaluation of the position was not

completed until August 11, 2004 – *after* Plaintiff made EEO contact on August 2, 2004.  (Reply

to Mot. for Summ. J. at 4.)  Thus, the decision in 2004 not to reclassify the position to an SES

does not fall within the purview of her 2004 EEO complaint.

Defendant has shown that the difference in salaries between Plaintiff's 2004 pay when

she held the CIO position and Mr. Carlson's 2006 pay when he held the CIO position were

justified by legitimate factors other than sex or race, and Plaintiff offers no evidence to rebut these legitimate, non-discriminatory factors. Therefore, this Court grants Defendant's motion for summary judgement on Plaintiff's pay discrimination claim.

### B. 2005 EEO Complaint

On October 15, 2005, Plaintiff made initial EEO contact regarding the alleged discrimination she suffered (1) when she was notified on August 2, 2005, that her CIO duties were being removed, and (2) when she was permanently reassigned to a Program Analyst position on October 2, 2005. (2005 ROI at 2.)

#### 1. *Removal of CIO Duties*

On August 2, 2005, Plaintiff received a memorandum from her immediate supervisor, Mr. Holman, notifying her that effective August 6, 2005, her CIO duties were being removed. (2005 ROI at 23.) Plaintiff did not contact an EEO counselor until October 15, 2005, more than 45 days after removal of her CIO duties became effective. (2005 ROI at 11.) Defendant thus argues that Plaintiff did not timely exhaust her administrative remedies with respect to the removal of her CIO duties. (Mot. for Partial Summ. J. at 10.)

It is unclear whether Plaintiff is pursuing the removal of her CIO duties as a basis for a Title VII discrimination claim. Plaintiff appears to concede that the removal of her CIO duties, standing alone, did not amount to an adverse employment action. (Opp'n to Mot. for Partial Summ. J. at 11; Hr'g Tr. 4/9/10 at 62-63, 66-67.) Plaintiff argues that the removal of her duties and the eventual reassignment to a Program Analyst position constituted one adverse employment action that did not become effective until her reassignment became effective on October 2, 2005. (Opp'n to Mot. for Partial Summ. J. at 11.) Defendant counters that the

removal of Plaintiff's CIO duties and the reassignment were two separate and discrete acts, and that administrative remedies for each must be exhausted. (Reply to Mot. for Partial Summ. J. at 3-5, 8.)

Plaintiff, however, raises for the first time in Plaintiff's Notice of Authority filed on April 14, 2010, the argument that the removal of her CIO duties was retaliation for her 2004 EEO complaint and that she need not separately exhaust the retaliation claim because it would have come within the scope of the investigation of the 2004 complaint. (Notice of Authority at 1-2.) This Court finds that Plaintiff has conceded that removal of her CIO duties did not form the basis for a racial or sex-based discrimination claim under Title VII. However, to the extent that Plaintiff is pursuing the removal of her CIO duties as a basis for a retaliation claim under Title VII, this Court will analyze that claim accordingly.

Under Title VII, the 45-day time limit to contact an EEO counselor starts running from the effective date of a discriminatory act or an adverse personnel action. 29 C.F.R. § 1614.105(a)(1); *see Weber v. Battista*, 494 F.3d 179, 182-83 (D.C. Cir. 2007). Prior to the Supreme Court's ruling in *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002), courts generally held that a plaintiff was not required to separately exhaust her administrative remedies for claims "like or reasonably related to the allegations of the [EEO] charge and growing out of such allegations." *See, e.g., Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (quoting *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). In *Morgan*, however, the Supreme Court held that "each incident of discrimination . . . constitutes a separate actionable 'unlawful employment practice.'" 536 U.S. at 113. "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."

*Id.; accord Porter v. Jackson*, 668 F. Supp. 2d 222, 229 (D.D.C. 2009) ("each discrete adverse employment action individually triggers Title VII's procedural requirements," such that a plaintiff alleging more than one discrete discriminatory action "must exhaust the administrative process [with respect to each allegedly discriminatory action] regarldess of any relationship that may exist between those discrete claims and any others.")

The lower courts have been unsure how to apply *Morgan* where a retaliation claim arises after a plaintiff has filed a formal administrative complaint. The circuits have split on whether a plaintiff must raise the new claim in a separate administrative complaint before bringing the claim to the district court, or whether the claim is encompassed within the initial administrative complaint. *Compare Wedow v. City of Kan. City*, 442 F.3d 661, 673-74 (8th Cir. 2006) (interpreting *Morgan* narrowly and holding that subsequent retaliatory acts that are of a like kind to those raised in the initial administrative complaint and specified to be of an ongoing and continuing nature need not be separately exhausted) *with Martinez v. Potter*, 347 F.3d 1208, 1210-11 (10th Cir. 2003) (holding that *Morgan* abrogates the continuing violation doctrine as previously applied to retaliatory actions and replaces it with a framework that requires each discrete incident of discrimination or retaliation to be exhausted).

While the D.C. Circuit has not weighed in,[4] several trial courts in this district have wrestled with the issue. A few earlier decisions have interpreted *Morgan* broadly to require plaintiffs to separately exhaust every discrete act of discrimination or retaliation regardless of whether it was "like or reasonably related" to claims in the administrative complaint. *See*

---

[4] *Weber v. Battista*, 494 F.3d 179, 183-84 (D.C. Cir. 2007) (declining to decide whether *Morgan* requires that a claim arising after the filing of a formal administrative complaint must be raised with the agency's EEO office before being brought in the district court).

*Romero-Ostolaza v. Ridge*, 370 F. Supp. 2d 139, 148-50 (D.D.C. 2005) (Lamberth, J.);

*Coleman-Adebayo v. Leavitt*, 326 F. Supp. 2d 132, 138 (D.D.C. 2004) (Friedman, J.).  Other

decisions within this district adopted a more narrow reading of *Morgan* and held that a court

could not entertain additional incidents omitted from an administrative complaint unless those

incidents fell within the "scope of any investigation that reasonably could have been expected to

result from [the] initial charge of discrimination." *Hazel v. Wash. Metro. Area Transit Auth.*, No.

02-1375, 2006 WL 3623693, at *8 (D.D.C. Dec.4, 2006) (Roberts, J.) (citing the post-*Morgan*

D.C. Circuit order in *Lane v. Hilbert*, No. 03-5309, 2004 WL 1071330, at *1 (D.C. Cir. 2004)).

*See also Lewis v. District of Columbia*, 535 F. Supp. 2d 1, 6-8 (D.D.C. 2008) (Urbina, J.)

(adopting and expanding on the holding in *Hazel*); *Jones v. Bernanke*, 685 F. Supp. 2d 31, 37

(D.D.C. 2010) (Urbina, J.) (same). Similar to the Eighth Circuit's holding in *Wedow*, the court in

*Lewis* and *Bernanke* requires claims of retaliation to be administratively exhausted unless they

are related to the claims in the initial administrative complaint and were specified in that

complaint to be of an ongoing and continuous nature.  *See Lewis*, 535 F. Supp. 2d at 8; *Bernanke*,

2010 WL 519757, at *5.  This Court finds the court's reasoning in *Lewis* and *Bernanke* to be

persuasive, adopts its holding, and applies it to the facts in this case.

Here, Plaintiff's 2004 complaint centers around allegations that since 1999 she was

denied promotions to the SES level on the basis of race and sex.  Plaintiff now urges this Court

to treat the removal of her CIO duties as of a like kind to the acts alleged in her 2004 complaint,

and alleges they would "have come within the scope of any investigation" of the 2004 complaint.

(Notice of Authority at 1.)  Plaintiff did allege in her 2004 complaint that the failure to promote

her to the SES level was of an ongoing and continuous nature.  (2004 ROI at 2-6.)  However, this

Court finds that the removal of her CIO duties is not "of a like kind" to the allegations in her 2004 EEO complaint that she was repeatedly denied promotions. The removal of her CIO duties is a discrete act, and Plaintiff was required to timely exhaust her administrative remedies as to this discrete act. Plaintiff failed to contact an EEO counselor within 45 days of August 6, 2005 – the effective date her CIO duties were removed. Thus, Plaintiff's claim of retaliation based on the removal of her CIO duties must fail because she did not timely exhaust her administrative remedies.

### 2. *Reassignment to Program Analyst Position*

After Plaintiff was notified that her CIO duties were being removed effective August 6, 2005, she requested that she be transferred out of that office instead of remaining as the Director of ITD. (Pl. Ex. 52; 2005 ROI at 24A.) Plaintiff was told to work from home until her transfer could be made effective. (Pl. Ex. 3 at 2.) In the interim, Plaintiff asked Mr. Holman where she would be reassigned, but he was unable to provide her with any details. (Hr'g Tr. 4/9/10 at 59-60.) The transfer became effective October 2, 2005. (2005 ROI at 17.) Plaintiff was transferred to a Program Analyst position that ultimately had very little substantive responsibility, no supervisory duties, and required her to work from home – a significant change from the CIO/Director of ITD position she held. (Opp'n to Mot. for Partial Summ. J. at 5; Pl. Ex. 3 at 3.) During the one year she held that position, Plaintiff was given only two assignments that amounted to a total of eight days of work. (Opp'n to Mot. for Partial Summ. J. at 5-6; Pl. Ex. 3 at 3.) It is unclear who ordered Plaintiff's transfer to this specific position. (Hr'g Tr. 4/9/10 at 60.)

Plaintiff claims that this transfer was an adverse employment action in violation of Title

VII. (Opp'n to Mot. for Partial Summ. J. at 13-14.) Defendant counters that Plaintiff has failed

to establish that she suffered an adverse employment action because (1) she was the one who

requested the transfer, and (2) because she failed to show "constructive demotion." (Reply to

Mot. for Partial Summ. J. at 7-12.) The D.C. Circuit has recognized that "reassignment with

significantly different responsibilities . . . generally indicates an adverse action." *Forkkio v.

Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002). A drastic reduction in responsibilities is an

"objectively tangible harm" even where a plaintiff does not suffer a reduction in grade, pay, or

benefits. *Holcom v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006).

    In this case, the record contains uncontroverted evidence that Plaintiff's duties

dramatically declined in both quantity and quality. (Opp'n to Mot. for Partial Summ. J. at 5-6;

Pl. Ex. 3 at 3.) Defendant argues that because Plaintiff requested a reassignment, she cannot then

use that reassignment as the basis for her Title VII claim. (Mot. for Partial Summ. J. at 11-14.)

However, Plaintiff is not alleging that the fact that she was reassigned constituted an adverse

employment action, nor is she alleging that she suffered a "constructive demotion." Plaintiff is

instead alleging that being reassigned to a position where her duties and responsibilities were

drastically reduced and where she no longer had any supervisory authority was the adverse

employment action. (Opp'n to Mot. for Partial Summ. J. at 13-14.) This Court agrees with

Plaintiff and finds that regardless of whether she requested the reassignment, the fact that she

suffered a drastic reduction, both quantitative and qualitative, in work assignments and

responsibilities constituted an adverse employment action.

    Thus, Plaintiff has established a *prima facie* case of race and gender discrimination based

on the reassignment to the Program Analyst position. It is uncontroverted that Plaintiff, an

African-American woman, is a member of a protected class. When Plaintiff was reassigned to the Program Analyst position and suffered a drastic reduction in duties and responsibilities, she suffered an adverse employment action (*see supra* at 21-22), giving rise to an inference of discrimination.

Plaintiff has also established a prima facie case of retaliation. The evidence is uncontroverted that Plaintiff engaged in prior EEO activity and that her reassignment constituted an adverse employment action. Additionally, because she was actively pursuing her original EEO complaint at the time she was reassigned, a reasonable jury could find a causal connection between her protected activity and the adverse action.

Defendant, moreover, fails to provide a legitimate, non-discriminatory reason for the adverse employment action. Defendant asserts that the legitimate, non-discriminatory reason for the transfer was the fact Plaintiff requested the transfer. (Mot. for Partial Summ. J. at 12.) Plaintiff, however, does not contest that she requested the transfer. It is not the fact that she was transferred that provides the basis for her claim. As established above, it was the fact that the transfer resulted in a permanent and drastic reduction in duties and responsibilities that provides the basis for her claim. *See supra* at 22. Defendant never addresses nor offers a legitimate, non-discriminatory reason why Plaintiff was reassigned to a position that carried almost no duties or responsibilities. As Defendant has not carried its burden to articulate a legitimate, non-discriminatory reason for the adverse employment action, a reasonable juror could conclude that Defendant acted with a discriminatory or retaliatory intent by reassigning Plaintiff to the Program Analyst position. Therefore, this Court denies summary judgment on this claim, as it relates to the 2005 EEO complaint regarding Plaintiff's permanent reassignment to the Program Analyst

position.

###     C.     2006 EEO Complaint

Plaintiff alleges that she was discriminated and retaliated against when she was not selected to the CIO position in 2006.  (Compl. ¶¶ 12, 14.)  It is uncontroverted that Plaintiff was a black female who had previously engaged in protected EEO activity and that she was subject to an adverse action when she was not selected to the CIO position.   In response, Defendant has offered legitimate, non-discriminatory reasons for Plaintiff's non-selection.  However, Plaintiff has offered sufficient evidence for a reasonable jury to find Defendant's reasons for non-selection were actually pretext for unlawful retaliation or discrimination.

For example, Defendant states that Plaintiff was not ultimately selected for the CIO position for the same reasons she lost the CIO duties in the first place – the series of complaints about her performance as CIO and her failure to attend mandatory agency meetings.  (Mot. for Summ. J. at 34-35; 2005 ROI at 24, 91; Pl. Ex. 35 at 42-44.)  However, there is no evidence in the record that she failed to attend these meetings beyond one agency official's statement that he did not recall her presence at the meetings.  (Pl. Ex. 31 at 53-54; 2005 ROI at 91; *but see* Pl. Ex. 35 at 42-44, 80-82; Pl. Ex. 54 (explaining that he remembers Plaintiff regularly attending the meetings).)  Defendant also points to poor IT ratings on the PMA scorecards as another reason for removing Plaintiff's CIO duties.  (2005 ROI at 24; Pl. Ex. 33 at 33, 36.)  However, the records that have been produced do not show that Plaintiff's department was poorly rated during her tenure.  (Pl. Exs. 16, 17 & 54.)  Defendant also indicates that complaints about Plaintiff's performance were based on IT problems raised in the 2002 and 2005 internal audits. (Pl. Ex. 33 at 33-37.)  However, the record contains evidence that Plaintiff was never made aware of these

problems. (Thomas Dep. 3/16/09 at 33-34; Pl. Ex. 32 at 34-35.) Furthermore, the record contains evidence that many of these problems were the result of a lack of funding and support, which Mr. Holman testified that he repeatedly brought to his superiors' attention. (Pl. Ex. 35 at 94-95.) Additionally, the record shows that Plaintiff received superior performance ratings up until her removal. (Pl. Ex. 35 at 61, 96.) According to Plaintiff and her direct supervisor, Mr. Holman, the first time either received any complaints about her performance was when they were notified that her CIO duties were being removed. (Pl. Ex. 53; Pl. Ex. 35 at 61.) This directly contradicts Ms. York's statement that she started receiving complaints about Plaintiff as early as 2004 and that she immediately reported them to Mr. Holman. (Pl. Ex. 27.) Mr. Combs also testified that he did not make any direct complaints to Mr. Knight or Ms. York about Plaintiff's performance, which contradicts Mr. Knight's statement that he received "numerous complaints" from Mr. Combs. (Pl. Ex. 31 at 52.)

"A plaintiff in a Title VII case is not limited to challenging the employer's explanation; she can also avoid summary judgment by presenting other evidence, direct or circumstantial, that permits an inference of discrimination." *Holcomb v. Powell*, 433 F.2d 889, 899 (D.C. Cir. 2006). Plaintiff also introduces evidence that shows she was excluded from important communications concerning the IT Division in which she, as CIO, should have been included. (Thomas Dep. 3/16/09 at 25-26.) Additionally, Plaintiff introduces evidence that Mr. Knight and Ms. York went over her head to give funding and priority to Jack Carlson for projects that conflicted with projects that Plaintiff assigned to him. (Thomas Dep. 3/16/09 at 25-27; Pl. Ex. 35 at 50-53, 83.) The record also contains evidence that Plaintiff was essentially dismissed by agency leadership when she spoke up at agency-wide meetings she attended on behalf of NRCS. (Pl. Ex. 35 at 46-

47.)  Her former supervisor, Mr. Holman, testified that he had to start attending those meetings with Plaintiff to obtain the relief she sought on NRCS's behalf.  (*Id.*)  Based on this evidence, a reasonable juror *could* find that the proffered legitimate, non-discriminatory reason for Plaintiff's non-selection to the CIO position was really pretext for discrimination or reprisal.  Therefore, the ultimate question – whether Defendant intentionally discriminated or retaliated against the Plaintiff – must be answered by a trier of fact who will have to evaluate the evidence and credibility of witnesses and determine which party he or she believes.  Thus, this Court denies summary judgment on this claim.

## V.     CONCLUSION

With respect to Plaintiff's pay disparity claim, Plaintiff has failed to rebut Defendant's legitimate, non-discriminatory reasons for the difference in pay between her and Jack Carlson, her comparator.  Plaintiff also failed to exhaust her administrative remedies with respect to her claim that her CIO duties were removed in retaliation for her prior EEO activity.  Thus, as to these two claims, Defendant is entitled to summary judgment.

With respect to Plaintiff's remaining claims, she has established a *prima facie* case of race and gender discrimination and retaliation with respect to her transfer to the Program Analyst position and non-selection to the CIO position.  In response, Defendant has offered legitimate, non-discriminatory reasons for its actions.  Plaintiff has countered with evidence sufficient to allow a reasonable juror to find those reasons were merely a pretext for discrimination or retaliation.  This creates a genuine issue of material fact that precludes summary judgement and requires the case to proceed to trial where a trier of fact will weigh the evidence, evaluate the

credibility of witnesses, and make the ultimate determination of whether Plaintiff was subject to

discrimination and retaliation.


Dated:   June 22, 2010                                _____/s/_____
                                                       ALAN KAY
                                                       UNITED STATES MAGISTRATE JUDGE